IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 1:05-10030-T |
| | ) | |
| THOMAS RUSSELL TACKETT, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER DENYING DEFENDANT THOMAS RUSSELL TACKETT'S MOTION TO SUPPRESS

The grand jury indicted Thomas Russell Tackett ("Defendant") for receiving and possessing an unregistered "silencer," for receiving and possessing a silencer that did not bear a serial number, and for receiving and possessing an unregistered "UZI," all in violation of federal law. Defendant moved to suppress evidence of the silencer and the UZI pursuant to the Fourth Amendment. On August 5th, 2005, the court held a hearing at which both Defendant and the Government presented evidence and argument. After the hearing, the court took the matter under advisement and advised the parties that it would issue written findings of fact and conclusions of law at a later date. For the reasons that shall follow, Defendant's Motion to Suppress is DENIED.

I. Findings of Fact

A. The Government's Proof

At the suppression hearing, the Government first presented the testimony of Steve Cornelius ("Trooper Cornelius" or "the Trooper"), now a retired member of the Tennessee Highway Patrol ("THP") who was on duty in the morning hours of June 21, 2004. At approximately 7:00 a.m., Trooper Cornelius arrived at the scene of a single vehicle accident on Pyburn Road in Hardin County, Tennessee. Trooper Cornelius observed an overturned vehicle on one side of the road that he estimated was one-hundred (100) feet down an embankment or ditch. When the Trooper arrived, two Hardin County sheriff's deputies were already working the accident. After the Trooper had a short discussion with the deputies, he went into an ambulance where he had been told he would find and did find Defendant. Defendant, according to Trooper Cornelius, appeared to be suffering from a "serious" head injury, and he was not able to remember many specifics regarding the accident.

While Defendant was lying down in the ambulance receiving medical assistance, Trooper Cornelius asked Defendant if Defendant "had anything on him or anything I needed to know about." Defendant moved his hand up and voluntarily relinquished a revolver that he had on his person in the ambulance. Because of Defendant's condition and because the medical personnel had decided that Defendant would have to be immediately evacuated to the hospital by helicopter, Trooper Cornelius did not converse with Defendant any further. Instead, Trooper Cornelius gave the revolver to the local deputies who, according to Trooper

2

Cornelius, had already located "a bag with firearms."[1] It was Trooper Cornelius's understanding at that time that Defendant would not have been allowed to keep the revolver in the ambulance.

The Trooper testified that the reason he was present at the scene was to investigate "the accident part of it." He concluded that Defendant had lost control of his vehicle while negotiating a curve. Pursuant to his duties with THP, the Trooper called a tow truck. Before the tow truck arrived, and also pursuant to "required procedure[s]" that the Trooper was to follow in a towing situation, Trooper Cornelius conducted an inventory of the vehicle and of the items inside. Trooper Cornelius's inventory list of the vehicle recorded the following items: two (2) umbrellas, one (1) pair of gloves, and one (1) blanket. (Def. Ex. 1).

On cross-examination, Trooper Cornelius testified that one of the reasons he had entered the ambulance was because the local deputies had informed him that they had discovered firearms inside a bag that Defendant had previously removed from his overturned vehicle. The Trooper had noticed this bag sitting on the tailgate of a truck that had not been involved in the accident. The truck was parked on the side of the road opposite the ditch where Defendant's vehicle was located.

The Government next called Deputy Billy Franks ("Deputy Franks" or "the Deupty"), of the Hardin County Sheriff's Department, to the witness stand. Deputy Franks had been dispatched to the accident scene before Trooper Cornelius. When the Deputy approached

---

[1] The Trooper assumed that the local deputies were conducting "a firearms investigation."

3

the scene, he observed Defendant's vehicle in a ditch on one side of the road, and he observed a pickup truck parked on the other side of the road. Several people were already congregated around the pickup truck, including Defendant. Defendant was sitting on the tailgate of the pickup truck. As everyone waited for an ambulance to arrive, Deputy Franks directed traffic, and he briefly spoke to Defendant to make sure that Defendant was not too seriously injured and could stay awake. Defendant was "more or less in and out, trying to stay awake."

Deputy Franks observed that Defendant was "worried" about a bag that was on the ground behind the tailgate of the pickup truck. The bag was a "dark color," and it had a "zipper" on it. This was the only bag that the Deputy remembered. The Deputy eventually picked this bag up, after Defendant was in the ambulance, and put the bag on the tailgate. Later, the Deputy decided to look inside the bag. He found firearms. He determined their type and ran a "check" on them to make sure that they were not stolen. He then put the firearms back into the bag, but he retained custody of it.

It was the Deputy's testimony that he had no suspicion of Defendant at the time he opened the bag or even after he found the firearms. Instead, he was merely taking an "inventor[y] [of the bag] to make sure that he didn't have no valuables in it so he couldn't come back and say that there was something in it that wasn't." He took this "inventory" because it was "pursuant to a policy of the Hardin County sheriff's department." The Deputy understood, based on experience, that Defendant would not have been permitted to retain

4

custody of the bag either in the ambulance or on the air-evacuation helicopter. These entities were "very strict" on not allowing such personal effects on board. The ambulance and air-evacuation teams would give a victim's personal property to the THP if the property was in the vehicle or they would give it to the deputies if outside of the vehicle. The department's policy, therefore, was to assume essentially exclusive custody of and to inventory property such as the bag.

The Deputy could not remember if he asked Defendant about any alternative means of securing the latter's personal property. The Deputy did recall that one of Defendant's co-employees came to the scene immediately before the ambulance left with Defendant. However, by then, the Deputy had already found the weapons, had conveyed that fact to Trooper Cornelius, and had received custody of the firearm(s) that Defendant had given Trooper Cornelius. The Deputy thus "wasn't going to turn the weapons over to just anybody." He instead intended to put them in a safe until Defendant recovered. The only way that the Deputy would have followed a different course of action with respect to the bag would have been if Defendant's "mother or father . . . [o]r wife" had been on the scene. He would not have given the bag to a co-employee of Defendant's without having first looked inside.

The Deputy returned the firearms, along with the revolver that Trooper Cornelius had recovered from Defendant, to the bag. He put the bag in the trunk of the police car. He testified that he was not concerned about the firearms because it was "not illegal to have the

5

guns, as far as [he knew], as long as they[] [were] registered."[2] He intended to take the bag to the station to "tag" the items and to put the bag in a safe. He intended to do all of this so that the department would not be "liable if [Defendant said] that there[] [had been] something in the bag that wasn't in the bag when I inventoried it."

When the Deputy arrived at the station, he took everything out of the bag and laid everything on an "investigator's desk" to "tag" the items in accordance with department policy. The Deputy observed the .38 caliber that had been found by Trooper Cornelius, a "machine gun" with four (4) loaded clips, a .22 caliber Ruger with six (6) loaded clips, a "switch-blade" knife, a "lock-blade" knife, a compass, and a camera. (Def. Ex. 2). According to the Deputy, he then discovered the silencer that led to the instant federal prosecution. He "inventoried" all of these items on a form entitled "Offense Report."[3] (Def.

---

[2] But see infra n. 3.

[3] The "Offense Report" might be read to contradict the Deputy's testimony that he had not found the silencer and was not suspicious before he arrived at the station. The report speaks in past tense, describing what the Deputy did at the scene as opposed to the station, and stating that "[a]t that time, [a] silen[cer]" was found." Deputy Franks testified that, while the report could be read that way, his intent when writing the report was to speak of the day's events as a whole. The court finds the Offense Report latently ambiguous at best and resolves the ambiguity in favor of the Deputy's sworn testimony regarding the meaning of the Offense Report. Moreover, for reasons explained infra, the court concludes that the Deputy would have been within the boundaries of constitutional reasonableness had he in fact conducted an extensive search at the scene itself before putting the backpack in his car ignorant of its contents. See infra. Therefore, the exact time that the Deputy found the silencer is not particularly significant.
   The report also suggests that the Trooper could have found the .38 on Defendant before the Deputy looked in the bag. The court also rejects this interpretation of the report because it conflicts with the testimony of all of the witnesses with personal knowledge of sequence, including Defendant himself.
   The Deputy also testified that a "property receipt," separate from the "Offense Report," was taken at the department. The property receipt was not introduced at the suppression hearing.

Ex. 2). He then contacted agents from the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") and informed the agents of the silencer and of the firearms. He also notified Defendant's employer, the Tennessee Valley Authority ("TVA"), of what he had found because it was not "kosher" with the Deputy that Defendant would take the firearms and silencers on TVA property.

On cross-examination, Deputy Franks testified that the items in the bag and the pistol(s) that were given to him by the Trooper were the only personal effects that he took custody of or inventoried, and he stated that he did not record any billfolds, keys, or similar items. In this case, moreover, it was THP's responsibility, and not the deputy's, to conduct the "vehicle" part of the inventory. He did not remember if Defendant had told him that Defendant wanted to contact someone else to take custody of his "zipper" bag. He did not recall Defendant having a second bag at the scene. It was, according to Deputy Franks, "impossible" that Defendant had more than one bag because the Deputy would have recorded such a bag if one had been present.

B.  The Defendant's Proof

Thomas Benson ("Benson") testified first for the defense. Benson was a passerby who was the first person to arrive at the scene of Defendant's accident. Benson observed Defendant walking up the embankment where Defendant's vehicle had overturned. Defendant walked up the embankment without assistance even though he appeared to have sustained a "real bad head injury." Defendant carried a "bag of some kind." Benson

7

positioned his truck to the side of the road opposite from where Defendant's vehicle had plummeted, and Benson and his brother began to assist Defendant. Defendant was "addled, "wanted to fall," and was "coming and going" in and out of sleep.

The first thing that Benson remembered the relevant law enforcement officials doing when they arrived was standing by the tailgate where Benson, his brother, Defendant, and the first medical responders had gathered. After the ambulance came, Benson witnessed one officer look inside Defendant's bag. Defendant was already in the ambulance or on the stretcher when the officer was looking through the bag. Benson did not observe any conversation between Defendant and the officer before the officer looked inside Defendant's bag. Benson did not remember the officer asking Benson or anyone else about the bag before peeking inside of it. Benson did remember that there was "a lady" present at the scene who worked with Defendant. He could not recall if "the lady" arrived before or after the ambulance had left. He remembered the officers questioning the lady as to why Defendant was in possession of the firearms. Benson did not remember if Defendant had been carrying one or two bags up the embankment

The defense's second witness was Dennis Wood ("Wood"), the first medical responder on the scene of the accident. Wood noticed that Defendant was responsive but slow. Wood treated Defendant for cervical spine injuries by placing a "C-collar" on Defendant while they waited for the ambulance. Wood helped Defendant in the ambulance and remained in the ambulance with Defendant.

8

Wood was present during and witnessed the encounter between Trooper Cornelius and Defendant. The Trooper first inquired about a firearm. Defendant responded that "it was legal" and that he did in fact have one on him. Defendant released this firearm, and perhaps another, to the Trooper. The Trooper then left the ambulance, and Wood did not see what the Trooper subsequently did with the firearm(s). Wood eventually rode in a separate vehicle to the landing zone where Defendant and the ambulance met the air evacuation team.

The defense's final witness was Defendant. Defendant "guess[ed]" that he had crawled from where his damaged vehicle was up to the road. Defendant remembered carrying both an "Olive Drab," or dark-green, backpack and also a darker, black leather "computer bag." Defendant remembered making phone calls to his mother in Alabama and to his foreperson at TVA. When Defendant made the calls, Defendant believed that he was "coming to work" that day notwithstanding his injuries.

After making the calls, Defendant sat on the back of Benson's truck. He remembered lying "on" the computer bag and he remembered placing the Olive Drab backpack on the ground beside his feet. When law enforcement came, while Defendant was either still on the truck or already in the ambulance, the officers began asking him what he did for TVA.[4] Furthermore, at approximately the same time that the ambulance arrived, Defendant remembered two (2) of his female co-employees[5] coming to the scene. They told Defendant

---

[4] Defendant was wearing a TVA badge and work clothes.

[5] The co-employees apparent names are "Jennifer Murphy and Tabby, the TVA supervisor."

9

that he could not work that day.

Because Defendant could not go to work, he testified, he called the TVA "operator" and told "them" that he was being transported to the hospital and that they should come to the accident scene and retrieve his "stuff." These "people" were there "within a matter of minutes." According to Defendant, Deputy Franks allowed one of Defendant's co-employees, who did not testify, to take custody of Defendant's "computer bag."[6] The Deputy did not allow the co-employee to take custody of the "Olive Drab" backpack. Defendant stated that his billfold was inside this computer bag.

When Defendant was inside the ambulance, one of the officers appeared and asked Defendant " '[w]hy do you have those guns in your [Olive Drab] bag[]." Defendant explained that he had his guns for target practice after work, and that he was leaving one of them with an acquaintance to be repaired that day while Defendant worked. Defendant testified that his co-employee had already come to the scene by this time. The officer informed Defendant that the officer would be retaining custody of all of Defendant's firearms related items and of Defendant's "Olive Drab" backpack. When Defendant asked the officer if everything was okay, the officer responded that there was no problem but that Defendant " 'just could[] [not] take the[] [firearms].' " Defendant told the officer that, because the officer had already obtained the items in Defendant's backpack anyway, Defendant would voluntarily give the officer the firearm(s) on Defendant's person. Other than the backpack,

---

[6]Defendant testified that he carried a computer and computer accessories in his computer bag.

10

the items in the backpack, and the gun or guns on Defendant's person, Defendant testified that his female co-employee took all of his other personal belongings from the accident scene with law enforcement's permission.

The court must find that most of Defendant's testimony is not credible. At the time of the relevant events, Defendant was seriously injured and was having trouble remaining awake. Despite all of this, he was apparently making calls to inform his employer and his mother that he was on his way to work. The "lady" that Defendant testified came to the scene to pick up his "computer bag" did not appear at the suppression hearing, and Defendant's testimony that the deputies allowed her to take his non-contraband belongings was not corroborated by any other witness. In short, the court finds that Defendant only had one "bag" at Benson's pickup truck on the date in question. The court further finds that, even if one or some of Defendant's female co-employees were at the scene, the deputies did not permit them to take custody of any of Defendant's personal effects.

II.

Defendant filed a motion to suppress the evidence found in the bag and on his person on the ground that the Fourth Amendment prohibited the search of the bag. Specifically, Defendant argued that a search warrant was a constitutionally indispensable prerequisite to the search in this case absent clear proof of an exception to the warrant requirement. Defendant insisted that no such exception applied to the facts. The Government, on the other

hand, argued that the "inventory search" exception could sustain the instant search notwithstanding the Deputy's failure to obtain a search warrant before searching Defendant's backpack. Alternatively, the Government maintains that, even if the search is ruled unconstitutional, the "inevitable discovery" doctrine permits the introduction of the tainted evidence at trial.

The Fourth Amendment to the United States Constitution, applicable to the states pursuant to the Fourteenth Amendment[7], provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. CONST. amend. IV. A search conducted without prior authorization by a detached and neutral judicial officer is *per se* "unreasonable" under the Fourth Amendment, unless a basis exists for applying one of the "'few specifically established and well delineated exceptions'" to the warrant requirement. Minnesota v. Dickerson, 508 U.S. 366, 372 (1993) (quoting, among other cases, Thompson v. Louisiana, 469 U.S. 17, 19–20 (1967) (per curiam)). The burden of establishing that a particular warrantless search falls within the boundaries of one of these exceptions is on the Government. If the court finds that the Government has satisfied this burden, the court will allow the evidence to be admitted at trial so long as the search was not otherwise "unreasonable." See, e.g., United States v. Knights, 534 U.S. 112,

---

[7]See Mapp v. Ohio, 367 U.S. 643 (1961).

12

118–19 (2001) ("The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'") (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)).

A.

"Inventory searches" conducted by law enforcement may be held reasonable under the Fourth Amendment even though they are not preceded by the acquisition of a search warrant. See, e.g., Colorado v. Bertine, 479 U.S. 367, 371 (1987); United States v. Kimes, 246 F.3d 800, 805 (6th Cir. 2001) (internal citations omitted); United States v. Fleming, 201 F.Supp. 2d 760, 770 (E.D. Mich. 2002). The inventory search must be executed in accordance with official department policies and procedures. Florida v. Wells, 495 U.S. 1, 4 (1990) (citing Bertine, 479 U.S. at 376 (Blackmun, J., concurring); Illinois v. Lafayette, 462 U.S. 640, 648 (1983)); South Dakota v. Opperman, 428 U.S. 364, 372 (1976). Moreover, the policies and procedures must not be administered in bad faith or used as general pretexts for conducting criminal investigations. Wells, 495 U.S. at 4; Bertine, 479 U.S. at 376 (Blackmun, J., concurring); Opperman, 428 U.S. at 382–83 (Powell, J., concurring).

"A range of governmental interests" explain why warrantless inventory searches are generally considered constitutionally permissible administrative procedures despite the Fourth Amendment's preference for search warrants in the criminal and investigative

13

context. Lafayette, 462 U.S. at 646. Those interests include, but are certainly not limited to, protecting the inventory from theft or damage while in police custody, protecting the custodian from disputes with the owner over allegedly lost or stolen property, and protecting the custodian from the safety risks associated with taking possession of unknown contents. Id. at 646–47. Closely related to, but separate from, these practical justifications is the concept that the police's role in society is not confined to catching and apprehending criminals; it instead extends to what is often referred to as " 'community caretaking.'" See, e.g., United States v. Markland, 635 F.2d 174, 176 (2d Cir. 1980) (citing Cady v. Dombrowski, 413 U.S. 433, 441 (1973).

When the police are acting in furtherance of these pragmatic considerations and/or in the context of their "community caretaking" role, the premises underlying the warrant requirement are weaker than when police are "fighting crime." See Opperman, 428 U.S. at 382–83. The warrant requirement is premised upon the notion of "probable cause," see U.S. CONST. amend. IV., and on the idea that "probable cause" will be demanded by a detached and neutral judicial magistrate before a search warrant will issue, see id. The goal is to protect the security of individuals in their "persons, houses, papers, and effects," against searches carried out by "overzealous" policemen. See Opperman, 428 U.S. at 383. When the police conduct "inventories," the officer is not necessarily relying upon an individual determination that certain "suspicious" circumstances exist that excuse the invasion of a citizen's privacy. Id. On the contrary, the officer is acting according to established

14

administrative guidelines mandated by his department. There is no need for a judge to determine if the policeman had "probable cause" to follow those guidelines. Id.[8]

This court recognizes that the Court's decisions out of which the "inventory search" exception arose most often if not always involved inventories of automobiles and of personal effects found inside of automobiles. They most often also involved persons who were already under arrest. E.g. Florida v. Wells, 495 U.S. 1, 2 (1990) (search of suitcase inside of arrestee's impounded automobile); Colorado v. Bertine, 479 U.S. 367, 368 (1987) (search of closed backpack removed from arrestee's vehicle at the scene while the officer waited for tow truck); Illinois v. Lafayette, 462 U.S. 640, 641 (1983) (search of "purse-type shoulder bag" taken by the arrestee to the booking station); Opperman, 428 U.S. at 366 (search of impounded vehicle that had been abandoned in a restricted parking zone); Cady v. Dombrowski, 413 U.S. 433, 442–43 (1973) (inventory of arrestee's vehicle that had been abandoned at the crime scene). However, the court does not consider itself confined to apply the inventory search exception *only* when automobiles are involved and *only* when the search is performed in conjunction with an arrest. See Lafayette, 462 U.S. at 641 (inventory search

---

[8]The Court in Opperman also explained that the warrant requirement also sought to decrease the occasion for judicial hindsight into the reasonableness of a particular probable cause determination made on the field. Opperman, 428 U.S. at 383. The Court found that the absence of a previously issued search warrant would not hamper the ability of trial judges to assess the reasonableness of an "inventory search." Id.
In Camara v. Municipal Court, the Court held that searches of premises by building inspectors pursuant to a building code were not exempt from the warrant procedure. Camara v. Municipal Court, 387 U.S. 523, 528–34 (1067). Opperman declined to extend Camara to the context of routine inventory searches carried out by police officers.

15

of arrestee's *person*); United States v. Markland, 635 F.2d 174, 175 (2d Cir. 1980) ("inventory" of effects that had scattered from an accident victim's vehicle). Neither of those circumstances fully explains the bases for the exception; the same practical and protective rationales exist regardless of the existence of a vehicle or an arrest.

Based on the foregoing, the court concludes that Deputy Franks was authorized by the inventory search exception to look inside the bag without a warrant, and the court likewise concludes that it was reasonable for him to do so. Although the court has not discovered a case in this jurisdiction that involves the same unique factual situation present in this case (where an accident victim pulls a personal effect from a wrecked vehicle and never technically relinquishes custody of the effect to the police), the court is of the opinion that the Fourth Amendment simply did not require Deputy Franks to choose between giving the backpack to a stranger, leaving the backpack on the road, or putting the backpack in his car or at the station without knowledge of the backpacks' contents.

United States v. Markland, decided by the United States Court of Appeals for the Second Circuit in 1980, is particularly instructive. In Markland, a postal worker lost control of his personal vehicle as he exited a major interstate. Markland, 635 F.2d 174, 175 (2d Cir. 1980), cert. denied, 451 U.S. 991 (1981). Several items flew from the vehicle and onto the road. Id. When a highway patrolman arrived at the scene, he met the postal worker in the rear of an ambulance. Id. The patrolman smelled alcohol on the postal worker's breath but did not suspect him of having committed any serious crime. Id. After the postal worker was

16

taken to the hospital, the patrolman began to clean up the items that had flown from the postal worker's vehicle during the accident. Id. Among other things, he found a "heavy" beverage bag. Id. He looked inside the bag, and there he found the evidence that instigated the postal employee's prosecution for several federal mail offenses. Id.

The trial court determined that the police essentially had no legitimate interest in "protecting" the defendant's personal belongings under the facts of that case. Id. at 176. The court of appeals reversed the judgment of the district court. Id. The court noted that "[p]olice have a duty to protect both the lives and the property of citizens." Id. (citations omitted). The court determined that a reasonable accident victim would expect the police to take custody of and to protect any of the victim's personal "effects" that, for whatever reason, the victim could not bring to the hospital. Id. Even if the police might not be civilly liable, the court continued, "[t]hey surely would be derelict in their duty to the public." Id. After affirming these police duties, the court then refused to hold that the patrolman was unreasonable for not retaining indefinite custody of a backpack without knowledge of its contents. Id.

Here, the evidence is that on the morning of June 21, 2004, Defendant swerved his vehicle to avoid hitting a deer. Defendant crawled from his vehicle some one-hundred (100) feet back to where the road was. Defendant carried one "Olive Drab" backpack, in which he had a reasonable expectation of privacy, with him to the road. Benson allowed Defendant to rest on the former's tailgate while the two waited for further assistance.

17

When law enforcement finally arrived, Defendant was at Benson's tailgate, and he was worried about his backpack. However, the officers were aware of the fact that Defendant would not be permitted to retain custody of his backpack in the ambulance or on the helicopter. Furthermore, the Hardin County Sheriff's Department had an established policy that the officers would more or less assume and retain custody of such personal effects for reasons unrelated to a criminal investigation. Finally, even if there may have been a co-employee present at the scene, and even if the co-employee had been ready, willing, and able to assume responsibility of the backpack, the officers had already discovered several dangerous instrumentalities by that time. By that time, the officers' own established guidelines did not permit them to surrender control of such instrumentalities to "just anybody" on the road.

In short, on the morning in question, the backpack was ultimately the officers' responsibility. They could not leave it with Defendant. They could not leave it on the road. They could not leave it with a "co-employee." Pursuant to department policy, and irrespective of any underlying law enforcement "suspicion" that one or more of the officers may have arguably had, the fact is that the officers had little if any discretion over the disposition of Defendant's backpack.

The Court concludes that, pursuant to the inventory exception to the warrant requirement of the Fourth Amendment, Deputy Franks was legally entitled to look inside the backpack either at the scene of the accident or back at the station without first obtaining a

18

search warrant. Second, the court concludes that Deputy Franks exercised his duty in a reasonable, good faith manner and not as a subterfuge for crime investigation. Accordingly, Defendant's Motion to Suppress is DENIED.

B.

Because the search was lawful, the court will not consider the Government's alternative argument that the "inevitable discovery" doctrine operates in this case to allow the introduction of unlawfully obtained primary evidence.

III.

Defendant's Motion to Suppress is DENIED.

IT IS SO ORDERED.

*/s/ James D. Todd*
JAMES D. TODD
UNITED STATES DISTRICT JUDGE

31 August 2005
DATE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 29 in case 1:05-CR-10030 was distributed by fax, mail, or direct printing on August 31, 2005 to the parties listed.

---

M. Dianne Smothers
FEDERAL PUBLIC DEFENDER
109 S. Highland Ave.
Ste. B-8
Jackson, TN 38301

James W. Powell
U.S. ATTORNEY'S OFFICE
109 S. Highland Ave.
Ste. 300
Jackson, TN 38301

Honorable James Todd
US DISTRICT COURT